UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| N.D., ) | |
| by and through his Mother and ) | |
| Next Friend, Beverly Dorman, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CASE NO. 2:13cv540-MEF-TFM |
| v. ) | [wo] |
| ) | |
| MARK M. GOLDEN, *et al.*, ) | |
| ) | |
| Defendants. ) | |

# **MEMORANDUM OPINION AND ORDER**

Now pending before the Court is Plaintiff's *Motion to Quash Subpoenas to Stanhope Elmore High School or, in the alternative, for a Protective Order* (Doc. 26, filed February 12, 2014).

## **I.    BACKGROUND**

On or about March 1, 2013, N.D.[1] and his friend J.S. were released from school for the day and planned to pick up an unnamed friend from the school bus stop near the friend's house. *See* Doc. 1 at 3-4. At around 3:00 p.m., N.D. parked along or near Gorey Drive in Millbrook, Alabama near a vacant lot to wait for his friend. *See* Doc. 1 at 4. A few minutes later, Mark Golden ("Golden") drove up in his personal vehicle, a Ford Mustang, and parked closely behind N.D.'s vehicle. *Id.* According to the plaintiff, Golden got out of his vehicle, wearing an Auburn University sweatshirt, and ran

---

[1] N.D. was 17 years old at the time of the incident, thus he was a minor and will be referred to solely by his initials.

up to the driver's side of N.D.'s vehicle and yelled "what the f*** are you doing on my property." *Id.* N.D. responded "my bad, if you will move your car I will leave;" however, Golden refused to leave and demanded that N.D. show him his hands. *Id.* When N.D. retorted that he did not know Golden, Golden replied that he works for the Department of Corrections and is a reserve officer for the city and demanded that N.D. exit his vehicle. *Id.*

N.D. said that due to Golden's threatening behavior he was "frightened and terrified," and he refused to exit his vehicle. *Id.* As a result, Golden reached through the open window of N.D.'s door and grabbed N.D. around his shoulders, neck, and head in an attempt to forcefully remove N.D. through the vehicle's window, ripping his shirt and scratching N.D.'s chest and neck in the process. *See* Doc. 1 at 4-5. N.D. broke loose of Golden's hold and fled the vehicle through the passenger's side door. *See* Doc. 1 at 4. Golden attacked N.D. and threw him to the ground, but N.D. broke loose and began running away. *See* Doc. 1 at 5. Golden ran to his car, retrieved his handgun, pointed it toward N.D., and repeatedly shouted that if N.D. did not stop running and drop to the ground, he would shoot. *Id.* N.D. slowed down and walked to the street and away from the area. *Id.*

Golden contacted dispatch and requested assistance. Officer Bo Knight ("Officer Knight") was dispatched to the scene. *Id.* Officer Knight arrived and spoke to Golden, who simply stated "it's in his back pocket." *Id.* Officer Knight found N.D. and thoroughly searched him, but discovered nothing illegal on his person. *See* Doc. 1 at

5-6. Regardless of that fact, N.D. was placed in handcuffs, advised that he was under arrest, and placed in the back of Officer Knight's police cruiser. *See* Doc. 1 at 6. Moments later, Corporal Brett Wadsworth ("Corporal Wadsworth") arrived and directed a complete search of N.D.'s vehicle, without consent. All three officers thoroughly searched the vehicle, but did not find any contraband. *Id.* The vehicle was subsequently impounded. *Id.*

N.D.'s mother arrived at the police station and was told that N.D. had been arrested for possession of marijuana; however, the officers released N.D. into her custody with no official charges. *Id.* N.D. later learned that he was charged and/or was being threatened with charges of harassment, trespassing, and possession of marijuana. *Id.*

N.D. alleges that based upon "information and belief," the City of Millbrook has a "custom, practice and or policy" of:

> (1) authorizing and allowing its reserve officers to engage in ordinary police functions including, but not limited to, arrests and searches, while alone and/or not under direct control and supervision of a certified law enforcement officer, and without having met the training requirements of the Alabama Peace Officers' Standards and Training Commission;
>
> (2) failing to adequately and properly control and supervise its reserve officers while such officers are engaged in police functions on behalf of the City; and
>
> (3) failing to adequately and properly train its reserve officers regarding the scope of authority held by a reserve officer.

*See* Doc. 1 at 6-7. N.D. asserts that the defendants' conduct proximately caused him to suffer "anger, anguish, anxiety, apprehension, embarrassment, emotional distress, fear,

[and] physical pain and suffering." *See* Doc. 1 at 7.

On or about February 6, 2014, Defendants advised Plaintiff that a subpoena to obtain N.D.'s "complete file" was submitted to the Custodian of Records for Stanhope Elmore High School. *See* Doc. 26 at 1-2. The following day, Plaintiff provided Defendants with a list of objections to the subpoena. *Id.* In opposition to the motion to quash, Defendants argue that N.D. waived his privacy rights under federal law by filing this lawsuit and placing his mental and emotional health directly at issue. *See* Doc. 28 at 3.

## II.   DISCUSSION

The issue before this Court is whether N.D.'s complete high school record is subject to discovery by the Defendants. *See* Docs. 26, 28. N.D. argues that allowing discovery of his complete educational record will violate his privacy rights and does not comport with Rule 26(b) of the Federal Rules of Civil Procedure which requires that the discovery "appears reasonably calculated to lead to the discovery of admissible evidence" because the incident took place after school and was not on school property. *See* Doc. 26 at 3-6. Defendants argue that N.D. failed to assert a privilege, but to the extent he is inferring Family Educational Rights and Privacy Act ("FERPA") protections, he is not protected because privacy rights under FERPA apply to nonparty educational records. Whereas here, defendant argues that N.D. "voluntarily pursued litigation," and has "placed certain aspects of his life at issue," specifically Defendants claim that N.D. has put his mental health at issue. *See* Doc. 28 at 3.

The Defendants correctly invoke FERPA as the relevant statute governing school records. *Id.* FERPA provides, in relevant part:

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of releasing, or providing access to, any personally identifiable information in education records other than directory information, or as is permitted under paragraph (1) of this subsection, unless—
>
> (A) there is written consent from the student's parents specifying records to be released, the reasons for such release, and to whom, and with a copy of the records to be released to the student's parents and the student if desired by the parents, or
>
> (B) except as provided in paragraph (1)(J), such information is furnished in compliance with judicial order, or pursuant to any lawfully issued subpoena, upon condition that parents and the students are notified of all such orders or subpoenas in advance of the compliance therewith by the educational institution or agency.

20 U.S.C. § 1232g(b)(2). In other words, "schools and educational agencies receiving federal financial assistance must comply with certain conditions." *Owasso Indep. Sch. Dist. No. I-011 v. Falvo*, 534 U.S. 426, 428, 122 S. Ct. 934, 937, 151 L. Ed. 2d 896 (2002) (citing 20 U.S.C. § 1232g(a)(3)). One such condition identified in the Act is that "federal funds are to be withheld from school districts that have 'a policy or practice of permitting the release of education records (or personally identifiable information contained therein ...) of students without the written consent of their parents.'" *Id.* at 428-29, 122 S. Ct. at 937 (quoting 20 U.S.C. § 1232g(b)(1)). The Act defines "education records" as "'records, files, documents, and other materials' containing information directly related to a student, which 'are maintained by an educational agency or institution or by a person acting for

such agency or institution.'" *Id.* at 429, 122 S. Ct. at 937 (quoting 20 U.S.C. § 1232g(a)(4)(A)).

The purpose of FERPA is "'assure parents of students ... access to their education records and to protect such individuals' right to privacy by limiting the transferability (and disclosure) of their records without their consent.'" *Alig-Mielcarek v. Jackson*, 286 F.R.D. 521, 525-26 (N.D. Ga. 2012) (quoting *Rios v. Read,* 73 F.R.D. 589, 597 (E.D.N.Y.1977)).  Courts have noted that "[a]lthough FERPA does not provide a privilege preventing disclosure of student records, it seeks to protect the confidentiality of educational records by threatening financial sanctions against those schools that adopt policies of releasing student records." *Id.* at 526 (citing *Rios,* 73 F.R.D. at 597; *see also Bigge v. District School Bd. of Citrus Cty., Fla.,* No. 5:11–cv–210–Oc–10TBS, 2011 WL 6002927, at *1 (M.D.Fla. Nov. 28, 2011); *Ragusa v. Malverne Union Free School District,* 549 F.Supp.2d 288, 291–92 (E.D.N.Y.2008).

However, Subsection (B) excuses schools from sanctions for disclosure of educational records if they are pursuant to a judicial order.  *Id.* (*Ragusa,* 549 F.Supp.2d at 291–92; *Rios,* 73 F.R.D. at 599); *see also* 20 U.S.C. § 1232g(b)(2)(B).  "Nevertheless, the 'privacy violations' that result from any disclosure of education records protected by FERPA are 'no less objectionable simply because release of the records is obtained pursuant to judicial approval unless, before approval is given, the party seeking disclosure is required to demonstrate a genuine need for the information that outweighs the privacy interests of the students.'" *Id.* (quoting *Rios,* 73 F.R.D. at 599); *see also Ragusa,* 549

Page **6** of **13**

F.Supp.2d at 292.  Several courts have released educational records after a determination that the records are clearly relevant to the claims at issue.  *See Ragusa,* 549 F.Supp.2d at 293–94; *Nastasia v. New Fairfield Sch. Dist.,* No. 3:04 CV 925(TPS), 2006 WL 1699599, *1–2 (D.Conn. June 19, 2006); *and Davids v. Cedar Falls Cmty. Sch.,* No. C96–2071, 1998 WL 34112767, *3 (N.D.Iowa Oct. 28, 1998).

Although the Defendants assert that this line of case law relates to nonparty educational records, after review of the plain language of FERPA, the balancing test established by these courts is clearly consistent with the purpose of the statute.[2] Furthermore, a distinction between whether the records are those of a party to the action or a nonparty is not relevant in the overall analysis and application of the balancing test. However, the party-nonparty distinction becomes important while reviewing the individual claims or alleged damages in conjunction with the specific portion of the records sought.

Here, N.D.'s claims involve an incident occurring after school hours and off-campus with an off-duty reserve officer.  Defendants claim that N.D.'s complete educational record will help them prepare their defense; however, Defendants completely fail to explain why there is a genuine need for N.D.'s academic, attendance, and disciplinary records, among others.  N.D.'s grades, attendance record, disciplinary record, etc. have absolutely no bearing on the claims involved in the instant action.  It is clear to this Court that Defendants' request for N.D.'s complete school record in defense

---

[2] Case law in this Circuit regarding FERPA and discovery of educational records is sparse, especially where the records belong to a plaintiff in the case.

of an after-hour, off-campus incident does not appear "reasonably calculated to lead to the discovery of admissible evidence" in this case, and they have failed to establish a "genuine need for the information that outweighs the privacy interests of [N.D.]." *See* Fed. R. Civ. P. 26(b); *Alig-Mielcarek*, 286 F.R.D. at 526. Thus, insofar as N.D. requests that this Court quash Defendants' subpoena for his complete educational records from Stanhope Elmore High School, the *Motion to Quash* is GRANTED.

However, Defendants make a specific request related any mental health records that might be contained in N.D.'s educational records. N.D. asserts that due to the harassment and arrest, he suffers from "anger, anguish, anxiety, apprehension, embarrassment, emotional distress, fear, and physical pain and suffering." *See* Doc. 1 at 7. Defendants argue that "these claims of damages [place] N.D.'s mental and emotional health directly at issue rendering any information about other problems, stresses, and/or complications that he has in his life relevant to Golden's defenses in this case." *See* Doc. 28 at 3.

Under both federal and Alabama law, psychotherapist/patient privilege is absolute.[3] *See Jaffee v. Redmond*, 518 U.S. 1, 15, 116 S. Ct. 1923, 1931, 135 L. Ed. 2d

---

[3] Psychotherapist/patient privilege is absolute in the federal context only in the sense that there is no balancing test to weigh the patient's privacy concerns versus the evidentiary need of the records:

> Making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege. As we explained in *Upjohn,* if the purpose of the privilege is to be served, the participants in the confidential conversation "must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at

337 (1996); and *Ex parte United Serv. Stations, Inc.*, 628 So. 2d 501, 503 (Ala. 1993). Defendants' subpoena seeks protected school mental health records. Thus, the records sought by Defendants are privileged and not subject to disclosure absent a waiver by N.D. *See Jaffee*, 518 U.S. at 15, 116 S. Ct. at ,1931, n. 14 ("Like other testimonial privileges, the patient may of course waive the protection"). Defendants argue that N.D. impliedly waived his privilege by placing his mental health at issue in the case at bar. *See* Doc. 28.

The Eleventh Circuit has been silent on the issue of implied waiver of psychotherapist/patient privilege; however, this Court as well as other federal courts have held that the privilege is impliedly waived where the plaintiff puts their mental or emotional state at issue. *See Kelly*, 2:05-CV-1150MHT-TFM, 2007 WL 2580492, *3 (This Court found that it could not "fathom a more clear example of voluntary waiver of the psychotherapist-patient privilege" than a plaintiff who claimed to have been diagnosed with bipolar disorder before the alleged incident, and post-traumatic stress disorder after the alleged incident in the jail.); *Wilson*, 2:09-CV-21-MEF-CSC, 2010 WL 1729111, *3 (Finding that the plaintiff affirmatively placed his mental health at issue, and thus the Court concluded "that the privilege which protects disclosure of psychotherapy records has been waived" after the plaintiff asserted claims for intentional

---

all."

*Jaffee*, 518 U.S. at 17-18, 116 S. Ct. at 1932 (citing *Upjohn Co. v. United States,* 449 U.S. 383, 393, 101 S.Ct. 677, 684, 66 L.Ed.2d 584 (1981)).

Page **9** of **13**

and negligent infliction of emotional distress and mental anguish).[4]   As noted in *Wilson*, the Eleventh Circuit has long recognized implied waiver in analogous privileges such as the attorney-client privilege.   *Wilson*, 2:09-CV-21-MEF-CSC, 2010 WL 1729111, *3 (citing *Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1417 (11th Cir. 1994)).[5]

However, other courts in this Circuit note that the majority of district courts have adopted a middle position, holding that a plaintiff does not put his or her mental health at issue by simply alleging mental anguish or "garden variety" emotional distress.   *Chase v. Nova Se. Univ., Inc.*, 11-61290-CIV, 2012 WL 1936082, *4 (S.D. Fla. May 29, 2012).[6]

---

[4] *See also Maday v. Pub. Libraries of Saginaw*, 480 F.3d 815, 821 (6th Cir. 2007) (By seeking emotional distress damages, the plaintiff had "put her emotional state at issue in the case" and therefore waived any psychotherapist-patient privilege); *Doe v. Oberweis Dairy*, 456 F.3d 704, 718 (7th Cir. 2006) ("If a plaintiff by seeking damages for emotional distress places his or her psychological state in issue, the defendant is entitled to discover any records of that state."); *Schoffstall v. Henderson*, 223 F.3d 818, 823 (8th Cir. 2000) (The plaintiff "place[d] . . . her medical condition at issue" by seeking emotional distress damages and therefore waived the psychotherapist-patient privilege.); *Fisher v. Southwestern Bell Tel.Co.*, 2010 WL 257305, *3 (10th Cir. 2010) ("Ms. Fisher's request for emotional-distress damages placed her psychological state in issue and entitled [the defendant] to discover her therapy records.").

[5] The attorney-client privilege "belongs solely to the client," and the client may waive it, either expressly or by implication."   *In re Von Bulow*, 828 F.2d 94, 100, 101 (2d Cir. 1987).   We have observed that the doctrine of waiver by implication reflects the position that the attorney-client provilege "'was intended as a shield, not a sword.'"   *GAB Business Services, Inc. v. Syndicate 627*, 809 F.2d 755, 762 (11th Cir. 1987) (applying Florida law) (quoting *Pitney-Bowes, Inc. v. Mestre*, 86 F.R.D. 444, 446 (S.D. Fla. 1980)).   In other words, "[a] defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes."   *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir.), *cert. denied* 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991); *accord United States v. Jones*, 696 F.2d 10369, 1072 (4th Cir. 1982) ("Selective disclosure for tactical purposes waives the privilege.")

[6] *See also Ortiz–Carballo v. Ellspermann,* No. 5:08–cv–165–Oc–10GRJ, 2009 WL 961131, at *2 (M.D.Fla. Apr.7, 2009) ("The majority of federal courts that have addressed the issue have held that a party does not place his mental condition in controversy merely by requesting damages for mental anguish or 'garden variety' emotional distress."); *Stevenson v. Stanley Bostitch, Inc.,* 201 F.R.D. 551, 553 (N.D.Ga.2001) ("The majority of courts have held that plaintiffs do not place their mental condition in

The courts have identified five conditions in which a plaintiff's mental health is placed "in controversy":

>   (1) stating a tort claim for intentional or negligent infliction of emotional distress;
>
>   (2) alleging a specific mental or psychiatric injury or disorder;
>
>   (3) alleging unusually severe emotional distress;
>
>   (4) intending to offer expert testimony to support a claim for emotional distress damages; and/or
>
>   (5) conceding that his or her mental condition is in controversy.

*Id.* However, it is unnecessary for the Court to grapple with whether the above conditions should provide a standard for this Court to follow, because it is clear that N.D. has placed his mental health at issue in this case.

Here, even considering the above conditions, N.D. has clearly put his mental health in issue by contending that he has suffered anger, anguish, anxiety, apprehension, embarrassment, emotional distress, and fear. *See* Doc. 1 at 7. In stating claims for anxiety, N.D. is clearly seeking damages for a "specific mental or psychiatric injury or disorder." *Id.*; *see also Tracey P. v. Sarasota Cnty.*, 8:05-CV-927-T-27EAJ, 2006 WL 1678908 (M.D. Fla. June 16, 2006) (finding that claims for "tremendous emotional harm" and "severe anxiety and fear" "present more than a simple allegation of emotional distress and place the individual Plaintiffs' mental condition in controversy for purposes of Rule

---

controversy merely by claiming damages for mental anguish or 'garden variety' emotional distress.")

35.""). N.D. has affirmatively placed his mental health at issue; therefore, the Court concludes that N.D. waived the privilege which protects disclosure of his psychiatric treatment records. Any records related to psychotherapy treatment contained in N.D.'s Stanhope Elmore High School records are discoverable in this case and insofar as N.D. requests this court to quash the subpoena related to psychotherapy treatment records, the *Motion to Quash* is DENIED. However, N.D.'s psychiatric treatment records should receive protection from uses that are outside of the scope of Defendants' defense in this case. Consequently, the Plaintiff's *Alternative Motion for Protective Order* is GRANTED. The parties shall submit a protective order with respect to N.D.'s mental health treatment records.

### III.    CONCLUSION

Accordingly, upon consideration of the motions, for the reasons as stated, and for good cause, it is ORDERED as follows:

(1) Insofar as Defendants' subpoena requests psychotherapy records contained in Plaintiff's Stanhope Elmore High School record, the Plaintiff's *Motion to Quash Subpoenas to Stanhope Elmore High School or, in the alternative, for a Protective Order* (Doc. 26), be and is hereby **DENIED**;

(2) Plaintiff's *Alternative Motion for Protective Order* (Doc. 26) be and is hereby **GRANTED**. The parties have until **on or before May 14, 2014** to submit a joint proposed protective order to govern Plaintiff's psychiatric treatment records; and

(3) Insofar as Defendants' subpoena requests Plaintiff's complete Stanhope

Elmore High School record, the Plaintiff's *Motion to Quash Subpoenas to Stanhope Elmore High School or, in the alternative, for a Protective Order* (Doc. 26) be and is hereby **GRANTED.**

DONE this 1st day of May, 2014.

/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE